UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| MARK DELEON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 2:21-cv-224 |
| | ) |
| NORFOLK SOUTHERN RAILWAY | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## ORDER AND OPINION

On July 13, 2021, Mark DeLeon lost his left arm in a horrendous accident while working the overnight shift at Norfolk Southern's Burns Harbor Trainyard. This case arises out of that tragic event. DeLeon sued Norfolk Southern under the Federal Employer's Liability Act seeking recovery for his injuries. He has two theories under FELA: one is for general negligence; the other is for *per se* negligence under FELA because of an alleged violation of the Safety Appliance Act ("SAA").

There are a number of motions presently before the Court: Norfolk seeks summary judgment on both of DeLeon's FELA claims.  [DE 86.] DeLeon seeks partial summary judgment on his claim under the SAA. [DE 70.] Finally, Norfolk seeks the exclusion of three of DeLeon's experts—Daniel Billington, Colon Fulk, and Jason Engle [DE 91.] In summary, I find there are genuine issues of material fact that preclude summary judgment on DeLeon's claims. As for the experts, they will all be permitted to testify subject to the limitations detailed below.

1

**Background**

In 2021, Mark DeLeon was a railman working for Norfolk. DeLeon had been working for Norfolk since 2011 and was trained biannually on the safety rules. [DE 100, ¶¶ 2-3.] He was also a member of Norfolk's Burns Harbor Safety Committee since 2016. *Id.* at ¶ 5.

On July 13, 2021, DeLeon was working the overnight shift at Norfolk's Burns Harbor yard. *Id.* at 6-7. He was working as part of a train crew to classify cars. *Id.* at 7.] He was the conductor. The team also had an engineer and a brakeman. [DE 93, ¶ 8.] While classifying cars, DeLeon would occasionally mount and dismount moving cars to travel throughout the yard. [DE 100, ¶ 8.] Norfolk's rules permit employees to get on and off moving equipment, but requires that they (1) select a safe location to get on; (2) be alert for nearby equipment, close clearances, and ground conditions; (3) not mount or dismount equipment moving faster than walking speed, which it defines as 3 MPH or less; (4) not mount or dismount moving equipment from the tailing end of the equipment; and (5) notify the engineer that they intend to mount or dismount so that the engineer can confirm the speed is 3 MPH or less. *Id.* at ¶ 9.

On the night in question, DeLeon first mounted a stationary locomotive. The engineer then moved it to a new location to connect it to a set of railcars. After it stopped, DeLeon got off and began checking the hand brakes while verifying that the cars matched the work order. *Id.* at ¶ 11. DeLeon then remounted the locomotive, and the engineer began moving the train once again. *Id.* at ¶ 12.

A short while later, DeLeon dismounted the locomotive without telling the engineer. It is undisputed that he did not tell the engineer he was dismounting, but DeLeon claims that it was normal practice not to always notify the engineer when dismounting. *Id.* at ¶ 14. He next stepped away from the train past some neighboring tracks, before turning back to remount it as it continued moving. *Id.* at ¶ 13; Ex. 13 (video of the incident). He attempted to board the fourth railcar, a flatbed, via a ladder on the rear of the car. [DE 100, ¶ 16.] The ladder is central to the dispute in this case. It was affixed to the flatbed railcar in a geometry such that it was bent outward by 6 ½ inches. *Id.* at ¶ 25. This means that anyone attempting to climb the ladder was forced to navigate it with the ladder leaning towards them. Here's a photograph of the ladder:



[DE 72, ¶ 37.]

DeLeon did not notify the engineer that he was attempting to mount the flatbed railcar. This is undisputed. [DE 100, ¶ 17.] But again, DeLeon asserts it was common practice to not always notify the engineer when mounting. *Id.* What's more, DeLeon states that he told the crew at the job briefing that he planned to ride this particular car. [DE 93, ¶ 17.] He asserts that he could not use the front ladder because it was too short, so he chose to ride the ladder at the rear of the car—the one pictured above. *Id.* at ¶ 15. DeLeon says that visibility is very limited in the yard at night, ostensibly making it harder to gauge a train's speed and see oncoming obstacles. Norfolk contests this, pointing to the lighting fixtures in the yard. *Id.* at ¶16.

It is contested whether DeLeon ran or walked up to the railcar to catch up to it. [DE 100, ¶ 18.] DeLeon admits via the submission of undisputed facts that the railcar was moving at approximately nine miles per hour at the time of the incident. *Id.* at 20. In his deposition, however, DeLeon testified that he thought it was not going faster than 2-3 miles per hour. [DeLeon Dep. 90:7-18.] How easy it is for a railman to gauge the speed of a moving train down to this level of specificity is a contested issue on which DeLeon's experts opine. Regardless, DeLeon was able to get two hands and at least one foot on the bent ladder while mounting the flatbed railcar. [DE 93, ¶ 21.]

As the train was moving down the track, and with DeLeon hanging from the ladder angled outwards, DeLeon says he hit an air station set up close to the track. *Id.* at ¶ 25. Air stations are box-like structures used to charge train brakes, and Norfolk added them to the Burns Harbor yard a few years prior to the incident at the request of the

Safety Committee. [DE 100, ¶ 27.] DeLeon's experts assert that the air station allegedly involved in the incident was too close to the track, making this kind of collision more likely. According to the expert, the air station was built 6 feet, 8 ¾ inches from the track center line, and this is too close. [DE 93, ¶ 81.]

Norfolk disputes that DeLeon hit the air station at all, arguing that it is impossible that he hit it and has retained experts to testify as to why. *Id.* at ¶ 25. Norfolk instead claims that DeLeon simply fell off the ladder. [DE 100, ¶ 19.] There is a video of the incident, but the camera was set up far away and provides an unclear, blurry recording, making the video non-dispositive as to this key point. Whether he fell or was knocked off the train when he hit the air station, DeLeon hit the ground, and his left arm went under a railcar and was traumatically amputated. [DE 93, ¶ 26.]

DeLeon was taken to the hospital immediately after the injury. At the hospital, Norfolk asserts, based on medical notes, that DeLeon told doctors he slipped and fell. DeLeon contests the veracity of these notes. [DE 100, ¶ 21.] DeLeon testifies that he was covered in bruises on his left side from hitting the air station, but Norfolk contests this on the grounds that no medical records from the hospital make any note of bruising. *Id.* at ¶¶ 23-24.

### Discussion

DeLeon has moved for partial summary judgment on the issues of duty and breach based on his contention that the bent ladder was a violation of the SAA and thus constituted negligence *per se* under FELA. [DE 71, 7.] For its part, Norfolk has moved for summary judgment on all theories of negligence, arguing that the bent ladder did

not constitute a violation of the SAA and that DeLeon's own negligence was the "sole cause" of his injuries, precluding any theory of negligence against Norfolk. [DE 87, 8-12.]

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). The fact that DeLeon and Norfolk have filed cross-motions for summary judgment does not alter the standard. The Court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

FELA provides that "[e]very common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier in [interstate] commerce," 45 U.S.C. § 51, and grants compensation to railroad employees for work-related injuries if "such injury or death [results] in whole or part from the negligence of any officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track ... or other equipment[.]" *Id.* DeLeon's claims under FELA fall into two categories:

6

*per se* negligence via an SAA violation and negligence directly under FELA. I'll start with the claim under the SAA.

### A.  The Safety Appliance Act and Negligence Per Se

The SAA does not create its own right of action. However, it allows employees whose injuries stem from SAA violations to sue their employers under FELA. *Crane v. Cedar Rapids & Iowa City Railway Co.,* 395 U.S. 164, 166 (1969). In essence, the SAA provides a shortcut for proving negligence when a railroad worker is injured on the job. It establishes a strict liability regime, such that if an employee can prove a violation of the SAA, then the employer is deemed negligent as a matter of law. *McGinn v. Burlington Northern R. Co.,* 102 F.3d 295, 298 (7th Cir. 1996); *Urie v. Thompson,* 337 U.S. 163, 189 (1949).

DeLeon asserts that the bent ladder he mounted during the incident in question was in violation of the SAA because the SAA requires that railcars be equipped with "secure" ladders. 49 U.S.C. 20302(a)(1)(C). In Congress's 1994 recodification of the SAA, it clarified that "secure ladders" are necessary "when required by the Secretary of Transportation." *Id.* This leads the Court to an obvious question: did the Secretary of Transportation require a ladder on the flatbed railcar at issue in this case?

"The FRA is part of the DOT and is authorized to exercise the Secretary of Transportation's powers under certain safety statutes[.]" *Marshall v. Grand Trunk Western R.R. Co.,* 850 F. Supp. 2d 686, 698 (W.D. Mich. 2011). The regulations are a little hard to follow, but here we go. The FRA promulgated specific safety standards for flatbed railcars in 49 C.F.R. § 231.6. That regulation states that flatbed railcars require,

7

among other things, "side handholds" in the same number and dimensions as required by box and other cars, which are regulated by § 231.1(h). That regulation, in turn, provides the dimensions for a side hand hold, and in the subsection's provision on the "number" of side hand holds required, states that four are required and, in parentheses in that subsection, explains that the "tread of a side ladder is a side handhold." § 231.1(h)(1). Citing to the mention of a ladder, DeLeon argues that, under the regulation, a side handhold "by the regulation's own terms, is a ladder." [DE 101, 4.]

But that's not exactly what the regulation says. Rather, it states that the *tread* of a side ladder counts toward the side handhold number requirement, not simply that all side handholds are ladders. Given the wording and structure of the regulation (mentioning this solely in parentheses at the end of the subsection's "number" requirement), the regulation can be read to be simply stating that if a railcar has a ladder, one of its treads counts toward the side handhold requirement. This parenthetical in the number requirement of this subsection does not transform side handholds into ladders under the SAA. A ladder is a different safety appliance with its own usage throughout the Federal Railroad Administration's regulation, with its own definition and requirements provided separately from that of side handholds. *See* § 231.1(e). When the regulations refer to ladders, they do so explicitly. Ladders are not a required safety appliance on flatbed railcars cars under the regulations. In other words, if Norfolk simply did not have a ladder on the flatbed car at all, that would not be a violation of the SAA, as they are not required to have one.

Even if we treated the tread of the side ladder as a side handhold for purposes of finding an SAA violation, it would not clearly resolve this in DeLeon's favor. As Norfolk points out, it appears that it would be only the "ladder's bottom rung" that would be counted as the side handhold for regulatory purposes, and there "is no suggestion that the bottom rung is bent or unsecured." [DE 106, 5.] Indeed, as the picture shows, the bend in the ladder is in the upper rungs. However, as discussed further below, the bend in the upper rungs affects the usefulness of the ladder tread that functions as a handhold. Imagine attempting to climb a ladder that is leaning towards you. Fortunately, the Court need not resolve whether the safety appliance DeLeon attempted to mount during the incident was directly required under the regulations. This is because, even if the safety appliance at issue in this case was not required by the regulations, it still falls within the purview of the SAA.

Here's why: Let's suppose the ladder in this case was not a mandated safety appliance. DeLeon argues that it can still be a violation of the SAA because the railroad chose to include the ladder on the car and it ended up being defective. In support of this contention, DeLeon points to *Shields v. Atlantic Coast Line R. Co.*, a Supreme Court case where the plaintiff was injured when a board on the top of a tank car he was standing on broke, causing him to fall. 350 U.S. 318 (1956). Much like this case, the railroad in *Shields* argued that the relevant regulations did not require the board, and thus the board fell outside of the SAA. The Supreme Court held otherwise:

> At best, appliances standardized in Commission regulations represent the minimum of safety equipment, and there is no prohibition of additional safety appliances. If a dome running board is provided by the railroad or

> the makers of the car and used by the railroad as an appliance necessary for the use of the car, it must be a safe board as required by [section 2 of the Safety Appliance Act].

*Shields*, 350 U.S. at 391. This suggests that an additional safety appliance necessary for the use of the car could still fall within the purview of the Safety Appliance Act. To counter this, Norfolk points out that *Shields* came out decades before the 1994 recodification, which changed the statute to specify that the SAA only requires boards (and ladders) *when required by the Secretary of Transportation*.

"When Congress amends legislation, courts must presume it intends the change to have real and substantial effect." *Ross v. Blake,* 578 U. S. 632, 64142 (2016). But this is merely a presumption, and a detailed analysis is necessary to make a final determination. Many courts have stated that the 1994 recodification of the SAA was not intended to have substantive effects. *See, e.g., Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 288 n.1 (4th Cir. 1999) ("Although the 1994 Federal Railroad Safety Authorization Act recodified the FSAA, the Railroad Safety Authorization Act's legislative history clearly demonstrates that the substantive provisions of the FSAA remain unchanged."); *Williams v. Norfolk Southern Ry. Co.*, 126 F. Supp. 2d 986, 992 n.6 (W.D. Va. 2000) ("This case interpreted the prior codification of the hand brake provision of the FSAA… However, as the 1994 recodification intended no substantive changes, its holding is still good law."); *Synar v. Union Pacific R. Co.*, 2001 WL 1263573, at *14 n.1 (Tex. App. 2001) (same).

None of these holdings should come as a surprise inasmuch as Congress specifically noted in the Act itself that the recodification was non-substantive: "[c]ertain

10

general and permanent laws of the United States, related to transportation, are revised,

codified, and enacted by subsections (c)-(e) of this section without substantive change."

Act of July 5, 1994, Sec. 1, 108 Stat. 745. Moreover, the legislative history is clear that:

> The purpose of [the Railroad Safety Authorization Act] is to restate in comprehensive form, *without substantive change,* certain general and permanent laws related to transportation… this bill makes no substantive change in the law. It is sometimes feared that *mere changes in terminology and style will result in changes in substance or impair the precedent value of earlier judicial decisions and other interpretations.* This fear might have some weight if this were the usual kind of amendatory legislation when it can be inferred that a change of language is intended to change substance. *In a codification law, however, the courts uphold the contrary presumption*: the law is intended to remain substantively unchanged.

S. Rep. No. 103–265, at 1, 5 (1994) (emphasis added).

In sum, the statute itself, the legislative history, and case law all support the

proposition that the recodification was non-substantive, and therefore, pre-1994 cases

like *Shields* involving the interpretation of the SAA are still precedential. What's more,

it's worth pointing out that Supreme Court cases aren't "overruled by implication."

*United States v. White,* 97 F.4th 532, 539 (7th Cir. 2024). And so, as low man on the judicial

pecking order, it is not for me to say that a Supreme Court case has been overruled,

even one like *Shields* that is 70 years old, without a clear statement to that effect by the

Court itself. This is likely why lower courts continue to cite *Shields* favorably even after

the 1994 amendment to the SAA. *See, e.g., Hall v. BNSF Ry. Co.,* 2018 WL 5808733, at *2

(W.D. Mo. June 5, 2018) (referring to *Shields* as "controlling precedent.").

Having established that *Shields* and other pre-1994 cases involving the SAA are

still good law, let's next look at how other courts have handled similar situations under

11

the SAA—in other words, situations where a safety appliance not mandated by a regulation nonetheless causes injury to a railroad worker.

In *Jordan v. Southern Ry. Co.*, 970 F.2d 1350 (4th Cir. 1992) the Fourth Circuit found *Shields* controlling when it held that a non-mandated safety appliance can still fall within the purview of the SAA. The Court noted: "We think that the teaching of these cases [including *Shields*] is that it is not necessarily dispositive of a Safety Appliance Act claim that the malfunctioning device is not specifically prescribed in the § 12 regulations." *Id.* at 1354. *See also Thomas v. Kansas City Southern Ry. Co.*, 305 S.W.2d 642, 646 (Tex. App. 1957) ("[I]t was the intent of Congress to require that all appliances which may fairly be classified as appliances mentioned in the Acts shall be secure, irrespective of whether the Acts actually require that cars be equipped with the appliances in the first instance. This is in effect the holding in *Shields*….").

The case of *Onysko v. Delaware & Hudson Railway Company, Inc.* is also instructive. In *Onysko*, a case that was decided well after the 1994 amendment, an employee traversing a crossover board on a gondola car fell when the platform collapsed. 2017 WL 372235, at *1 (M.D. Pa. Jan. 26, 2017). Platforms were required on some cars, but not on gondola cars, similar to how ladders are required on some cars, but not on flatbed cars. *Id.* at *5. Citing to *Shields*, the court found that while "crossover boards are not specifically required by the FSAA on gondola cars, it nonetheless constitutes a safety appliance for the purpose of the FSAA, because once Defendant undertook to provide this board, it had a duty to ensure that the appliance was safe and secure, as required by the FSAA." *Id.* at *6.

Our case is similar to *Onysko.* Ladders are not required on flatbed railcars; however, Norfolk chose to include a ladder in lieu of a handhold on the flatbed railcar at issue in this case. Once a safety appliance is included on a railcar, it must be compliant with the SAA's requirements for that safety appliance, subject to the necessity requirement discussed below. A reasonable jury could find that DeLeon was injured during the use of the ladder, and there are genuine disputes of material fact as to whether the ladder's defective bend was the cause of his injury.

There's one additional part of *Shields* that needs discussing—recall that under *Shields* a non-mandated safety appliance can be in violation of the SAA only if it is "*necessary for the use of the car.*" *Shields*, 350 U.S. at 324 (emphasis added). *Shields* involved a tank car, which, in order to release its contents, required employees to go on top of the car to remove a dome cap. *Id.* at 319. Thus, the non-SAA mandated safety device was "necessary for use of the car." *Id*. This is in sharp contrast with cases like *Puskarich v. Burlington Northern Santa Fe Railway Co.*, in which the court distinguished *Shields* on the grounds that a brake stick (a hooked rod used to grip and pull hand brakes) was not a necessary appliance, because railmen could turn handbrakes without brake sticks. 2022 WL 611271, at *4 (D. Wy. Jan. 7, 2022).

The necessity of a safety appliance is a case-specific inquiry. The question is: was the safety appliance necessary to interact with the specific railcar involved in the case at issue. *See id.* at 4 ("There are no facts presented which render the brake stick in our instant case a necessary appliance…"). The FRA regulations require flatbed railcars to have side handholds for a reason. Construing all facts in favor of the non-movant, a

13

reasonable juror could find that these side handholds, in conjunction with sill steps, could reasonably be seen as required so that railmen can readily mount flatbed railcars and are necessary for proper use of the railcar. In this case, the flatbed railcar had a ladder with a tread that functioned as a side handhold. In order to interact with the safety appliance that the FRA required—the ladder tread functioning as a side handhold—it was necessary that DeLeon come in contact with the ladder. And in so doing, he would have to navigate the awkward geometry of the ladder. The photo included above readily demonstrates just how difficult it would likely be climbing an inverted ladder.

*Johnson v. Union Pacific R. Co.* provides useful analysis for this point. In that case, the plaintiff was injured while attempting to re-secure an allegedly defective air hose support strap. 2004 WL 2402844, at *1-3 (N.D. Ca. Oct. 27, 2004). Union Pacific argued that this could not be an SAA violation because the support straps are not specifically required by the SAA. *Id.* However, the court, citing *Atchison, Topeka & Santa Fe Ry. Co. v. Scarlett,* 300 U.S. 471 (1937), found that the support strap was not "separate and distinct" from the air brake system generally, which was required. *Id.* at *4. *Johnson* stands for the proposition that an appliance that is "part of" a required safety system and not "separate and distinct" from it can be analyzed alongside the required safety appliance. *Id.* Like how the support straps were not separate and apart from the air brake system in *Johnson*, the ladder was not separate and apart from the tread functioning as the required side handhold. In other words, by interacting with the tread of the ladder, DeLeon *had* to interact with the defective ladder, as they were, quite

14

literally, the same constructed appliance. Thus, because the ladder was functioning as part of a required appliance that a reasonable jury could find necessary, this Court cannot find that summary judgment against DeLeon on the SAA claim is appropriate.

To hold otherwise would produce absurd results. Suppose a rail company had a flatbed railcar with four ladders, each with a compliant tread functioning as the required side handholds. To accept Norfolk's argument, these ladders could *never* be in violation of the SAA even if every other rung of the ladder were bent so far out as to prevent any meaningful use of the tread of the ladder functioning as the required handhold. Such a set up would make the safety appliance more of an obstacle to mounting the railcar than a benefit. A "safety" appliance that does more harm than good is not sensible.

This does not finish the analysis. The SAA requires that ladders, when required, be "secure." DeLeon argues that "[s]ecure means safe." [DE 71, 5.] That's too broad of an interpretation of the Act. *Nash v. Norfolk and Western Ry. Co.*, 93 F. Supp. 2d 703, 705 (W.D. Va. 2000) ("The term 'secure' should not necessarily be equated with the word 'safe.'"). "Congress purposefully distinguished this duty to provide *secure* appliances on railroad vehicles from that of a similar railroad safety measure, the Boiler Inspection Act, which requires all locomotives to be 'in proper condition and *safe* to operate.'" *Nash*, 93 F. Supp. 2d at 705 (quoting *Collins v. Southern Pac. Co.,* 286 F.2d 813, 815 (9th Cir.1961)). This is a meaningful distinction. Some safety issues railmen may encounter, "such as snow, ice, oil, or grease on steps or ladders do not render them

unsecure." *Sheehy v. Southern Pac. Transp. Co.*, 631 F.2d 649, 653 (9th Cir.1980) (collecting cases).

However, "worn, slick and *bent* appliances, like those discussed in *Sheehy v. Southern Pac. Transp. Co., 631 F.2d 649, 653* (9th Cir. 1980), are issues of 'secureness,' because they relate to the mechanical and structural nature of the appliances themselves." *Nash*, 93 F. Supp. 2d at 705 (emphasis added); *see also Sheehy*, 631 F.2d at 653 ("[W]orn and slick and bent steps do present a jury question on 'secureness.'"). The ladder in question was severely bent. This was a mechanical and structural issue with the appliance itself, and a reasonable jury could find that it made the ladder unsecure in violation of the SAA.

In sum, Norfolk's motion for summary judgment is denied as it relates to the strict liability claim. Plaintiff's motion for partial summary judgment is also denied. This is a "mixed question of fact and law" which will require the jury to assess whether the ladder was so bent as to render it a violation of the SAA. *Foreman v. BNSF Ry. Co.*, 2013 WL 5945803, at *3 (W.D. Wa., Nov. 6, 2013); *see also Sheehy*, 631 F.2d at 653 ("[W]orn and slick and bent steps do present a jury question on 'secureness.'").

**B. Norfolk's Summary Judgment Motion on General Negligence**

DeLeon additionally claims that Norfolk was negligent directly under FELA. Unlike his claim under a *per se* theory, negligence claims brought directly under FELA must satisfy all of the common law elements of negligence, albeit with some modification. Under FELA, a railroad is liable for damages to any employee who suffers injury resulting in whole or in part from the negligence of any officers, agents, or

16

employees of the carrier. *Holbrook v. Norfolk Southern Ry. Co.*, 414 F.3d 739, 741 (7th Cir. 2005). FELA was designed to offer broad remedial relief and thus has a relaxed burden for the critical element of causation. *McBride v. CSX Transp., Inc.*, 598 F.3d 388, 403 (7th Cir. 2010). In a FELA case, causation is satisfied where "the employer's negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Id.* (quoting *Rogers v. Missouri Pacific Railroad Co.,* 352 U.S. 500, 506 (1957).

DeLeon claims that Norfolk was negligent in various ways: by having a rule allowing employees to get on and off moving railcars, by having poor lighting on the tracks that made it difficult for DeLeon to spot potential obstacles like the air station, by building the air station too close to the rail line, by having a railcar in use with a bent ladder that made DeLeon's body angle further out from the train when he mounted it, etc. DeLeon has supported, with evidence, that these factors, independently and/or in combination, constitute negligence.  His evidence consists of his own testimony as well as a slew of expert reports and record evidence.

These supported theories of negligence which, if true, could result in liability under FELA's lessened standard, have been contested by Norfolk, which has brought forth its own experts and evidence. This has created a number of genuine disputes of material fact, as can be seen in the facts of this case described above. These genuine disputes of material fact include whether DeLeon hit the air station, whether the ladder being bent out contributed to DeLeon's fall, whether it was unnecessarily hazardous for Norfolk to allow its employees to mount and dismount moving cars at all, and to what extent DeLeon's rule violations are to blame for the incident.

17

Norfolk argues that this Court should enter summary judgment in its favor because "DeLeon's own negligence was the sole cause of his injuries." [DE 87, 8.] This argument scarcely needs discussion. And indeed, Norfolk all but withdrew it at oral argument. This is because a reasonable jury could readily find that Norfolk's negligence contributed in some part to DeLeon's injury. The facts in this case show that the ladder in question was notably bent and that the incident occurred at least *near* an air station that a reasonable jury could conclude was the reason DeLeon fell. Also, as described more below, DeLeon has provided admissible expert testimony that it was unsafe for Norfolk to allow employees to *ever* get on and off moving trains and that the lighting was insufficient in the railyard. On these facts, a reasonable jury could conclude that Norfolk's negligence contributed to DeLeon's injuries, even if DeLeon's own negligence may have also been a factor. *See Keane v. Northeast Illinois Commuter R.R. Corp.*, 2002 WL 1806919, at *3 (N.D. Ill. 2002) ("Metra next suggests that Keane 'was the sole and proximate cause of his alleged injury' because he tried to force the handbrake to release in violation of Metra procedures. But this argument, which is more properly characterized as a contributory negligence defense, also raises a jury question.") (internal citations omitted).

Because there are genuine disputes of material fact which, if decided in DeLeon's favor could result in Norfolk's liability under FELA, Norfolk is not entitled to summary judgment on DeLeon's negligence theories directly under FELA.

### C. The Expert Opinions of Billington, Fulk, and Engle

Norfolk has moved to exclude the expert causation opinions of Daniel Billington,

Colon Fulk, and Jason Engle. The admissibility of expert testimony is governed by Federal

Rule of Evidence 702, which provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under this framework, I must act as a gatekeeper for expert testimony, determining

prior to admission whether the testimony is both relevant and reliable. *U.S. v. Pansier*, 576

F.3d 726, 737 (7th Cir. 2009). In conducting this inquiry, I must focus on principles and

methodology, not on the conclusions they generate. *Winters v. Fru-Con Inc.*, 498 F.3d 734,

742 (7th Cir. 2007). The goal of this inquiry "is to assure that experts employ the same

'intellectual rigor' in their courtroom testimony as would be employed by an expert in the

relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.

v. Carmichael*, 526 U.S. 137, 152 (1999)).

As an initial general matter, the parties disclosed to this Court during oral

argument that this case may have up to *twenty* experts in all. That number strikes me as

rather absurd. From just the ones being challenged here, it is apparent that many of the

experts have some redundant conclusions and areas of expertise. The Court warns the

parties that, at trial, it will not allow either side to call redundant experts where their

testimony would be cumulative or waste time under Federal Rule of Evidence 403.

Next, I agree with Norfolk that the expert reports of Billington, Fulk, and Engle

have some improper legal conclusions. Billington, Fulk, and Engle all state that certain

19

facts constitute a statutory violation and/or negligence. These conclusions "abridge[]

the jury's role of applying the law to the facts" and, additionally, "usurp[] the judge's

role of instructing the jury as to the applicable law." *Arrington v. City of Chicago*, 2022

WL 2105871 at *5 (N.D. Ill. June 10, 2022). The experts will not be allowed to testify as to

what satisfies a specific legal standard or what a particular statute or regulation means.

However, of course, experts may offer opinions "*relevant to applying* a legal standard"

including testimony "describing sound professional standards and identifying

departures from them[.]" *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013)

(emphasis added). Many of the experts' opinions fall into this category, warranting

further consideration.

### 1. Daniel Billington

Daniel Billington is an expert in accident reconstruction, including "human

factors, visibility, and lighting." [DE 91-4, 2.] Billington has been doing accident

reconstructions for decades and has been permitted to testify in a number of cases. He

inspected the site of the incident and took various measurements, as well as reviewed

the footage from the night in question as well as an extensive list of documentary

evidence and depositions in this case. He concluded, among other things, that DeLeon

struck the air station during the incident in question, that the air station was a close

clearance structure, that the yard was too dark which posed a danger to employees, and

that the bent ladder prevented DeLeon from being upright, contributing to him hitting

the air station. [DE 91-2, 37-40.] Billington is an accident reconstructionist with decades

of experience. He took detailed and specific measurements at the railyard, including

quantifiable lighting measurements under similar weather and time conditions, and he used his experience and measurements to produce a 3D render of the accident to explain how this tragic and perplexing incident occurred.

This Court finds that Mr. Billington is qualified to testify to these topics, and that his inspection of the site, reliance on his experience, and review of the documents constitute a proper methodology for an accident reconstructionist. *Berry v. Wisconsin Central Ltd.*, 2022 WL 3576203, at *11 (W.D. Wis., Aug. 19, 2022) ("Plaintiff had adequately explained Billington's experience and the data he used in rendering his opinions. All of Wisconsin Central's criticisms go to the weight the jury should give his opinions, not to their admissibility.").

One argument Norfolk makes that requires special attention is that Billington's accident reconstruction testimony would not be helpful to a jury. The argument centers on the fact that much of his accident reconstruction is based on the video of the incident, which the jury can watch itself. Indeed, courts often exclude expert testimony analyzing videos when a jury is just as capable of doing the same thing. *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004) (affirming exclusion of expert opinion that was based on a video because "the videotape could be played for the jury and entered into evidence, and consequently, jurors could make a determination for themselves"). But in cases where an expert opinion relating to a video is excluded, there is little technical analysis being offered and the expert is simply recounting what he sees. The opinion is therefore excluded on the grounds that the video "speaks for itself." *Clement v. Stanley Access Techs. LLC*, 2016 WL 4443702, at *2 (W.D. La. Aug. 19, 2016).

21

This Court has watched the video of the incident several times. It does not speak for itself. The camera was set up far away from the site of the incident. The video is dark, at times blurry, and in black and white. Moreover, there are various obstacles and moving railcars that make deciphering what is happening difficult. It is unclear, even, how DeLeon's left arm ended up being severed in this incident.

An accident reconstructionist who can reliably help explain this incident would surely be helpful to the jury. Moreover, while Norfolk argues Billington brings no more to the table on this issue than a layperson who watches the video, a review of Billington's report tells a different story. Mr. Billington relied on his extensive experience in accident reconstruction, used video enhancement techniques to view it more closely, employed the study of kinematics in his analysis, did an in-person inspection of the incident site, and produced a 3D model of the incident to help explain what happened. Billington has provided an analysis that goes way beyond a simple recounting of what he believes the video depicts. And to the extent Norfolk is dubious of Billington's opinions, that's what cross-examination is for. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination.").

### 2.  Colon Fulk

Colon Fulk has over three decades of experience in train operations. Notably, he has worked for Norfolk as a conductor, brakeman, locomotive engineer, and a foreman. He has extensive experience in railroad operations, including safety inspections and

investigations. In this case, he reached various conclusions about the safety of the train yard the night of the incident, the safety rules Norfolk had in place at the time, and factors that may have contributed to the accident. He testifies to how difficult it is for on-the-ground railmen to know exactly how fast a train is going, especially in nighttime conditions, and that it was unsafe for Norfolk to have a rule allowing railmen to board moving trains *at all*. He testifies to many other issues as well, including the dangers posed by the defective ladder and insufficient lighting at the railyard. In coming to his conclusions, he not only relied on the documentary evidence in this case but also his inspection of the site of the incident.

Norfolk's main arguments to exclude Fulk's opinions are that he lacks a reliable methodology and that his opinions are conclusory. However, the Court finds that he has employed a proper methodology for an expert in his field and has explained his reasons sufficiently. He reviewed the records relevant to the incident, and inspected the site of the incident, taking specific measurements and photos, and explained the reasons for his findings in an expert report. This is not an area of expertise where, for example, an expert could point to specific mathematical methodology for his opinion. Fulk's methodology and opinions (that are not legal conclusions, as discussed above) are proper, and are similar to many other cases in which he has been allowed to testify over the years. *See, e.g.*, *Pierce v. Chicago Rail Link, LLC*, 2005 WL 599980 (N.D. Ill., March 15, 2005); *Guinn v. Norfolk Southern Ry. Co.*, 441 F. Supp. 3d 1319 (N.D. GA. 2020); *CSX Trans., Inc. v. General Mills, Inc.*, 2024 WL 3430496 (N.D. Ga., July 16, 2024).

Norfolk points to three cases where Fulk was not allowed to testify, but those cases are distinguishable, do not explain their reasoning, or are very qualified exclusions. *Nat'l RR Passenger Corp. v. Cimarron Crossing Feeders*, 2018 WL 5962876 (D. Kan. Nov. 14, 2018) (excluded from offering opinions regarding a train derailment); *Sims v. Union Pacific RR*, 2007 WL 4616258 (D. Wyo., April 27, 2007) (offering no explanation of why Fulk's opinions were excluded in a two sentence opinion); *Loy v. Norfolk Southern Ry.*, 112 F. Supp. 3d 795 (N.D. Ind. 2015) (only excluding a "narrow" portion of Fulks opinions that rely solely on a particular University of Michigan study on ergonomics and finding that "the rest of Mr. Fulk's opinion is appropriate and within the scope of his expertise.").

Fulk may testify, subject to the general admonishments discussed above. Similar to the court in *Guinn v. Norfolk*, this Court concludes that Norfolk's issues with Fulk's opinions "can be handled by cross examination." 441 F. Supp. 3d at 1332 (internal quotation marks omitted).

### 3. Jason Engle

Jason Engle has 18 years of experience in the railroad industry, holding both mechanical and transportation positions at multiple railway companies. His conclusions include that the bent ladder was unsafe, that the railcar with the bent ladder should not have been in service until the ladder was fixed, and that Norfolk had insufficient, and at times even actively dangerous, safety procedures.

Norfolk's argument to exclude Engle is a bit shorter and refers to or mirrors the arguments on Fulk, namely that the expert lacks methodology and has conclusory

opinions. [DE 91, 14-16] ("Like Mr. Fulk, Mr. Engle lacks any apparent methodology"; "describes his methodology in almost identical language to Mr. Fulk's"; "As with Mr. Fulk, Mr. Engle performed…"). The only notable difference is that they admit that Engle provided some "additional detail" compared to Fulk. *Id* at 16. Like Fulk's expert report, Engle's expert report exhibits that he has relevant, specialized experience and that he employed a reliable methodology. For the same reasons Fulk's opinions are admissible, the Court has little trouble finding Engle's non-legal opinions admissible, subject to the limitations in this opinion.

## Conclusion

For the reasons stated above, DeLeon's partial motion for summary judgment [DE 70] is DENIED, and Norfolk's cross motion for summary judgment [DE 86] is DENIED. Norfolk's omnibus motions in limine on the causation opinions of experts Billington, Fulk, and Engle [DE 91] is GRANTED IN PART and DENIED IN PART as described above.

SO ORDERED.

ENTERED: May 19, 2026.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT